UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-61198-CIV-MARRA/SELTZER
<u>CONSENT CASE</u>

HANSON HAMS, INC.,

     Plaintiff,

v.

HBH FRANCHISE COMPANY, LLC,

     Defendant.

_____/



MEMORANDUM OPINION AND ORDER ON
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

     THIS CAUSE is before the Court on Defendant HBH Franchise Company, LLC's

Motion for Summary Judgment (DE 33) and Supporting Memorandum of Law (DE 34), and

was referred to the undersigned on the consent of the parties.  Having carefully reviewed

the papers in support of and in opposition to said Motion and being otherwise fully advised

in the premises, it is hereby ORDERED that the Motion is GRANTED.

I.    <u>BACKGROUND</u>

     This action concerns the acquisition of the Heavenly Ham franchise system, of

which Plaintiff is a franchisee, by a subsidiary of Defendant.  Defendant is the franchisor

of Heavenly Ham's major competitor, the HoneyBaked Ham franchise system.  Plaintiff

alleges that Defendant's post-acquisition treatment of the Heavenly Ham system *vis-a-vis*

its treatment of the HoneyBaked Ham system has been "unfair," "deceptive," and/or

"unconscionable" within the meaning of the Florida Deceptive and Unfair Trade Practices

Act ("FDUTPA"), Florida Statutes Section 501.201 *et seq.*  The relevant facts are as

follows.[1]

Two cousins, Heather Haglund and Jody Covello, co-own Plaintiff Hanson Hams. In 2001, Haglund decided to open a Heavenly Ham franchise after having seen an advertisement in a Minnesota newspaper for franchise opportunities with the company.[2] Haglund Dep. at 15.   The franchisor of the Heavenly Ham system at that time was Paradise Foods, Inc.  Id. at 20-21.   Haglund contacted Paradise in response to the advertisement; Paradise advised her that a then-existing Heavenly Ham franchise in Davie, Florida was for sale.  Id. at 16.  As a result, Haglund contacted Covello, who lived in South Florida and with whom she had previously worked at a car rental company, to inquire whether Covello would be interested in purchasing the franchise with Haglund.  Id. at 19, 23-24; Covello Dep. at 51-52.  Covello agreed, and the two subsequently formed Hanson Hams for the purpose of acquiring the Davie, Florida Heavenly Ham franchise.  Haglund

---

[1] Plaintiff and Defendant have submitted statements of material facts in support of and in opposition to Defendant's Summary Judgment Motion.  To the extent that Plaintiff (the non-movant) controverted the facts alleged by Defendant, the Court adopted the facts set forth within Plaintiff's statement.  See Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997).   To the extent that Plaintiff did not controvert the facts alleged by Defendant and those facts were supported by the record, the Court adopted the facts contained within Defendant's statement.  See S.D. Fla. L.R. 7.5.D ("All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the opposing party's statement. . . .").  Plaintiff's Response in Opposition to Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and Plaintiff's Statement of Undisputed Material Facts Raising Genuine Issues to be Tried (DE 51) is referred to herein as "Plaintiff's Undisputed Facts." Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment (DE 35) is referred to herein as "Defendant's Undisputed Facts."  Lastly, the transcripts of the Depositions of Heather Haglund and Jody Covello – which are contained in Volume 1 of Defendant's Exhibits in Support of its Summary Judgment Motion (DE 41) – are referred to herein as the "Haglund Dep." and the "Covello Dep.", respectively.

[2] At the time, Haglund lived in Minnesota. Haglund Dep. at 15-16. She later moved to Florida. Id. at 39.

2

Dep. at 25, 35.

Prior to its acquisition by Haglund and Covello, the Davie franchise's sales had been languishing for several years.  Defendant's Undisputed Facts ¶ 5 (DE 35).  In the four years immediately preceding Haglund's and Covello's acquisition, the Davie franchise's annual sales had declined from $430,202 in 1997, to $399,643 in 1998, to $345,975 in 1999, to $289,580 in 2000.  Caldwell Declaration ¶ 3 (DE 37).  Nevertheless, Haglund and Covello decided to purchase the Davie franchise and relocate it to a "newer area." Haglund Dep. at 26.  The two paid $30,000 to the prior franchisee to acquire the Davie franchise, id. at 25; and on September 9, 2001, Plaintiff executed a franchise agreement with Paradise and paid a "transfer fee" of $7,500 to move the Davie franchise to a new location on Sunrise Boulevard in Plantation, Florida.  Plaintiff's Undisputed Facts at 2, ¶ 7 (DE 51).  Plaintiff also secured a long-term lease on the new location.  Id. (DE 51). Plaintiff was represented by counsel when it executed both the franchise agreement and the lease.  Id. at 2, ¶ 8 (DE 51).

Before agreeing to purchase the Davie franchise, Haglund and Covello discussed with Paradise Plaintiff's ability to open additional Heavenly Ham franchises.  Id. at 7, ¶ 8 (DE 51).  Although Paradise apparently advised Plaintiff's principals that "future development would be permitted and that [Plaintiff] would be granted a right of first refusal to develop future Heavenly Ham stores," id. (DE 51), the franchise agreement did not grant Plaintiff the right to open any additional Heavenly Ham stores, id. at 2, ¶ 10 (DE 51).  In addition, the franchise agreement expressly provided that Paradise "maintain[ed] the right to merge, acquire, joint venture or affiliate with any existing franchise business, whether competitive or not."  Franchise Agreement § 13.6 (emphasis added) (Exhibit 1 in Volume

3

2 of Defendant's Exhibits in Support of its Summary Judgment Motion (DE 42)); accord
Plaintiff's Undisputed Facts at 2, ¶ 13 (DE 51).

Prior to opening their franchise, Haglund and Covello received training at Heavenly
Ham's "Ham College," as well as marketing assistance from Paradise.   Caldwell
Declaration ¶ 6 (DE 37); Haglund Dep. at 41.  Haglund and Covello also attended store
operations training in Atlanta; and Jenni Chambers, a Field Marketing Manager at
Paradise, provided Haglund and Covello with additional on-site training in store operations.
Haglund Dep. at 46-47.  Plaintiff's new franchise opened in October 2001.  Plaintiff's
Undisputed Facts at 2, ¶ 16 (DE 51).

In its first year of operation (October 2001 through October 2002), Plaintiff's sales
totaled $295,841.98, almost the same volume as the prior franchisee's sales in the year
preceding Plaintiff's purchase (and move) of the Davie franchise.  Id. at 2, ¶ 18 (DE 51).
This amount, however, was far below Heavenly Ham's store average ($472,806) and
median sales ($432,686) for 2002.  Id. at 2, ¶ 19 (DE 51).   The franchise performed
similarly in 2003, with sales totaling $290,868.  Id. at 7, ¶ 41 (DE 51).

In June 2002, Paradise announced that it was being acquired by Franco
Acquisitions, LLC.  Id. at 3, ¶ 25 (DE 51).  Franco is a subsidiary of Defendant formed
solely to acquire the assets of Paradise.  Id. at 3, ¶ 29 (DE 51).  As a result of the
acquisition, Franco became the franchisor of the Heavenly Ham system, and it assumed
Paradise's interest in Plaintiff's franchise agreement.  Id. (DE 51).[3]

---

[3] Franco subsequently changed its name to the HH Franchise Company, LLC.
Plaintiff Undisputed Facts at 8, ¶ 10 (DE 51).  For ease of reference, the Court refers to HH
as Franco throughout this Order.

4

Following the acquisition, representatives from Franco and the Original HoneyBaked Ham Co. of Georgia (owner of 109 HoneyBaked Ham stores in the Southeastern United States) put on "road shows" to explain the future plans for the Heavenly Ham system. Id. at 4, ¶ 32 (DE 51). They informed Heavenly Ham franchisees that they would have three options, depending on their proximity to existing HoneyBaked Ham stores and whether those stores were corporate-owned or franchised: continue operating as Heavenly Ham stores; convert to HoneyBaked Ham stores; or, sell to Original. Bengochea Declaration ¶ 5 (DE 38). Since the Franco acquisition, 52 of the approximately 185 Heavenly Ham franchises have closed – 25 were purchased by Original, 8 were converted to HoneyBaked Ham stores, and 19 closed on their own. Plaintiff's Undisputed Facts at 13, ¶ 33 (DE 51); Plaintiff's Exhibit G.[4] Franco has decided that it will not add new franchises to the Heavenly Ham system. Plaintiff's Undisputed Facts at 13, ¶ 36 (DE 51).

Plaintiff ultimately was advised that it could not convert to a HoneyBaked Ham franchise due to its proximity to a corporate-owned HoneyBaked Ham store. Plaintiff's Undisputed Facts at 4, ¶ 35 (DE 51). Thus, Plaintiff was given the option of either selling to Original or continuing to operate as a Heavenly Ham franchise. Plaintiff's Undisputed Facts at 4, ¶ 35 (DE 51); Bengochea Declaration ¶ 8 (DE 38). Sometime in late 2002, Plaintiff began to explore the prospect of selling its Heavenly Ham franchise to Original. Haglund Dep. at 77. Following some discussion with Original representatives, who had reviewed Plaintiff's profit and loss statements and tax returns, Original offered Plaintiff approximately $100,000 for its franchise. Id. at 82-83; Plaintiff's Undisputed Facts at 6, ¶

_____

[4] Plaintiff's Exhibits are attached to a Notice of Filing dated July 22, 2004 (DE 53).

38 (DE 51). Plaintiff rejected Original's offer and made a counteroffer of approximately $600,000. Id. at 6, ¶ 39 (DE 51); Haglund Dep. at 84; Letter from Heather Haglund and Jody Covello to Charles Bengochea at 2 (Exhibit 3 in Volume 2 of Defendant's Exhibits to its Motion for Summary Judgment (DE 42)). Plaintiff's counteroffer was rejected, and on June 11, 2003, Plaintiff commenced this action in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida. See Notice of Removal ¶ 1 (DE 1). Plaintiff's Complaint asserts a single claim against Defendant – that certain of Defendant's post-acquisition conduct violated the FDUTPA. See id. (DE 1).

On June 19, 2003, Defendant removed the action to this Court on the basis of diversity jurisdiction. See id. (DE 1). The parties then consented to a disposition of the case before the undersigned (DE 18) and, after the Court denied Defendant's Motion to Dismiss, the parties engaged in discovery.

Defendant has now filed a Motion for Summary Judgment (DE 33) and Supporting Memorandum of Law (DE 34); Defendant raises four arguments in support of its Motion. Defendant first argues that the FDUTPA cannot apply to the facts of this case because Defendant does not compete with Plaintiff. See Memorandum at 14-15 (DE 34). Defendant next argues that Franco's acquisition of the Heavenly Ham franchise system was not "unfair, deceptive or wrongful" and that it took no actions subsequent to the acquisition arguably falling within the FDUTPA's ambit. See id. at 16-17 (DE 34). Defendant's final two arguments are closely related. Defendant argues that Plaintiff has failed to show that it has suffered any damages as a result of Defendant's conduct; Defendant further argues that, even if Plaintiff could demonstrate that it has been damaged, Plaintiff cannot show any causal connection between the alleged FDUTPA

6

violation and the damages it seeks.  See id. at 18-19 (DE 34).

Plaintiff has responded to each of Defendant's arguments.  Plaintiff first argues that Defendant need not be in competition with Plaintiff for the FDUTPA to apply.  See Opposition at 14-15 (DE 52).  Plaintiff next argues that Defendant's conduct following the acquisition did violate the FDUTPA.  See id. at 15-17 (DE 52).  Specifically, Plaintiff points to the following post-acquisition conduct in support of its argument: (1) Defendant's purportedly more favorable treatment of HoneyBaked Ham franchisees (as compared to Heavenly Ham franchisees) with respect to advertising, utilization of the shipping center for customer product deliveries, franchise royalties, and ham and turkey pricing; (2) Defendant's closure/conversion of certain Heavenly Ham stores and its refusal to open additional Heavenly Ham stores; (3) Defendant's alleged decline in field support to Heavenly Ham franchisees; (4) Defendant's failure to install a point-of-sale system in Heavenly Ham stores; and (5) two allegedly false statements by Defendant's CEO soon after the acquisition.  See id. at 4-13, 15-17 (DE 52).  Finally, Plaintiff argues that it has suffered damages; it asserts that as a "direct and proximate [result] of the decision to cease the sale of Heavenly Ham franchises and cease the opportunity for franchisees to acquire additional Heavenly Ham franchises," its own Heavenly Ham franchise has been rendered "valueless."  See id. at 18-19 (DE 52).

II.    CONTROLLING LEGAL PRINCIPLES

   A.    Standard of Review on a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, a court "must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997). "All reasonable doubts about the facts should be resolved in favor of the non-movant." Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999).

    B.    Scope of, and Purpose Behind, the FDUTPA

"One of the primary enunciated purposes of [the] FDUTPA is to 'protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.'" Macias v. HBC of Fla., Inc., 694 So. 2d 88, 90 (Fla. 3rd DCA 1997) (quoting Fla. Stat. ch. 501.202(2)). To that end, the FDUTPA specifically renders unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts." Fla Stat. ch. 501.204(1). To maintain a private cause of action for legal (as opposed to equitable) relief under the FDUTPA, a plaintiff must show not only that the conduct complained of was unfair, unconscionable, or deceptive, but also that it has suffered actual damages proximately caused by the unlawful conduct. See Macias, 694 So. 2d at 90; Himes v. Brown & Co. Secs. Corp., 518 So. 2d 937, 938 (Fla. 3rd DCA 1988) (noting that FDUTPA requires a plaintiff to suffer "actual damages proximately caused" by the defendant); Fla. Stat. ch. 501.211 ("In any action brought by a person who

has suffered a loss as a result of a violation of [the FDUTPA], such person may recover actual damages . . . .") (emphasis added).  To achieve its goal of protecting consumers and businesses from unfair, unconscionable, or deceptive acts or practices, the FDUTPA must be "construed liberally."  Fla. Stat. ch. 501.202.

III.  DISCUSSION

    A.    The Acts About which Plaintiff Complains are not "Unfair" under the FDUTPA

Before analyzing whether Plaintiff's claim survives Defendant's Motion for Summary Judgment, the Court finds it telling to recognize what Plaintiff has not asserted in its Complaint.  In particular, Plaintiff has asserted no claim against Franco, which – as a result of the acquisition – is now the franchisor of the Heavenly Ham system, as well as the successor in interest to Paradise's rights (and liabilities) in Plaintiff's franchise agreement.  In other words, although Plaintiff alleges that various unfair actions have been taken against the Heavenly Ham system, Plaintiff asserts no claim against the franchisor of that system.  Nor does Plaintiff claim that any of these allegedly unfair actions resulted in a breach of the franchise agreement.  For example, in its Opposition, Plaintiff suggests that Paradise executives made misleading statements about Plaintiff's ability to open additional Heavenly Ham stores before Plaintiff purchased its Heavenly Ham franchise.  See Opposition at 4 (DE 52).  Yet, Plaintiff has brought neither a fraudulent inducement claim nor a claim under the FDUTPA against Franco (Paradise's successor) concerning those alleged misrepresentations.[5]

_____

[5] The Court notes that any such claim would be subject to arbitration pursuant to Plaintiff's franchise agreement.  See Franchise Agreement § 18.2 (Exhibit 1 in Volume 2 of Defendant's Exhibits in Support of its Summary Judgment Motion (DE 42)).

Instead, Plaintiff predicates the lone claim in its Complaint solely on Defendant's control of both the Heavenly Ham system and the HoneyBaked Ham system. According to Plaintiff, this relationship "pits franchise siblings against one another while placing the parent [Defendant] . . . in a position where it can favor (and has favored) one franchise system over the other by way of promotion, development and support." Opposition at 2 (DE 52).[6] Stated differently, Plaintiff complains that Defendant has violated the FDUTPA as a result of "the disproportionate, unconscionable and unfair manner in which [Defendant] has treated [Plaintiff's] primary competitor." Id. at 15 (DE 52). To that end, throughout its papers Plaintiff attempts to paint Defendant as a malevolent wrongdoer intent upon eliminating the recently acquired Heavenly Ham system in general and Plaintiff's franchise in particular. See, e.g., id. at 1-2 (DE 52) (arguing that Defendant "has engaged in a systematic attempt to strangle the Heavenly Ham franchise system" and has "attempted to isolate [Plaintiff's] franchise in its market area in order to drive it out of business"); Id. at 11 (DE 52) (asserting that as a result of the acquisition, "the Heavenly Ham system is dying a slow death and Hanson is dying with it").[7]

_____

[6] Plaintiff incorrectly describes the Heavenly Ham system and the HoneyBaked Ham system as "franchise siblings." Opposition at 2 (DE 52). Defendant is the franchisor of the HoneyBaked Ham system, and Defendant also is the corporate parent of the franchisor (Franco) of the Heavenly Ham franchise system. See Plaintiff's Undisputed Facts (DE 51) at 3, ¶ 29. Accordingly, the two systems are not "siblings," but rather are positioned in more of a parent-subsidiary relationship.

[7] Notably, Plaintiff does not appear to argue that the acquisition of the Heavenly Ham system itself violated the FDUTPA, nor has Plaintiff asserted a claim under the antitrust laws. Rather, Plaintiff appears to base its claim solely on Defendant's conduct after the acquisition. See Opposition at 17 (DE 52) (noting that Plaintiff "is not suing [Defendant] simply because its [sic] acquired the Heavenly Ham system; the suit is brought as a result of [Defendant's] control over both systems and its actions which pit sibling franchises against one another"); but see Plaintiff's Objections and Responses to

As an initial matter, the Court has difficulty accepting the premise that Defendant wishes to "strangle the Heavenly Ham franchise system," which it acquired only a short time ago.  Indeed, standing unrebutted is the testimony of Charles Bengochea, Defendant's Chief Operating Officer, that Defendant has

> no intent to destroy or damage the Heavenly Ham system.  To the contrary, [Defendant has] taken substantial steps to improve the Heavenly Ham system, including using [its] purchasing power to lower food and other costs, developing a new lunch program for that system, developing a new look and feel for the concept, and spending funds on advertising for that system.

Bengochea Declaration ¶ 4 (DE 38); see also Caldwell Declaration ¶ 2 (DE 37) ("Since the acquisition, my role and purpose at [Franco] have remained the same:  to promote the Heavenly Ham brand and to drive sales in the Heavenly Ham system.  I have never been directed by anyone, explicitly or implicitly, to harm any Heavenly Ham store, to help put a Heavenly Ham store out of business, or to do anything that would adversely affect the business of the Heavenly Ham system.  To the contrary, since the acquisition we have continued to promote the Heavenly Ham system and to provide assistance to Heavenly Ham franchisees.").  Defendant's supportive actions belie Plaintiff's contentions that Defendant intends to drive the Heavenly Ham system out of business.[8]

The seeming implausibility of Plaintiff's theory notwithstanding, when stripped of its

---

Defendant's First Set of Interrogatories at 4 (included in Volume 1 of Defendant's Exhibits to its Motion for Summary Judgment (DE 41)) (Plaintiff "contends that the acquisition of the Heavenly Ham system by an affiliate of [Defendant] is the sole cause that it is aware of for the business losses at [Plaintiff's] store.").

[8] Plaintiff admits that a new Heavenly Ham lunch menu has been put into place since the acquisition, see Haglund Dep. at 117-18, and that it has continued to receive store visits from Jenni Chambers, the Heavenly Ham Field Marketing Manager who serviced Plaintiff's store prior to the acquisition, see Plaintiff's Undisputed Facts (DE 51) at 4, ¶ 42 (DE 51).

rhetoric, Plaintiff's claim places the following question in issue: does a corporation violate the FDUTPA by not according two of its related entitles the same treatment?  Although the Court believes that circumstances may exist in which this question might be answered in the affirmative, the Court concludes that on the facts presented here the question must be answered in the negative.

In reaching this conclusion, the Court begins its analysis by reviewing the language of the FDUTPA itself.  As noted above, the FDUTPA renders unlawful "unconscionable acts or practices" and "unfair or deceptive acts."  Fla Stat. ch. 501.204(1).  Here, although Plaintiff does not specify whether it considers Defendant's actions "unconscionable," "unfair," or "deceptive" (or some combination thereof), a close reading of Plaintiff's Opposition suggests that Plaintiff predicates its argument on the "unfair" treatment it claims to have received following the acquisition.[9]  The Court, therefore, must decide whether a reasonable jury could conclude that Defendant's actions amount to "unfair acts" within the meaning of the FDUTPA.[10]

The FDUTPA does not define the term "unfair act."  The Florida Supreme Court, however, has held that such an act is "one that 'offends established public policy' and one

---

[9] The only actions identified by Plaintiff which arguably could be considered "deceptive" are two allegedly false statements made by Defendant's CEO shortly after the acquisition had been consummated.  However, as set forth in note 13, infra, those purported misrepresentations do not support Plaintiff's FDUTPA claim.

[10] Defendant argues that because it does not compete with Plaintiff it cannot be held liable for "unfair competition" under the FDUTPA.  See Memorandum at 14-15 (DE 34).  This argument is inapposite.  Plaintiff does not assert that Defendant has engaged in "unfair competition"; rather, it bases its claim on Defendant's allegedly "unfair acts," a separate prong of the FDUTPA.  See Fla. Stat. ch. 501.204(1) (rendering unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts").

that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" PNR, Inc. v. Beacon Property Mgmt,, Inc., 842 So.2d 773, 777 (Fla. 2003) (citation omitted).  Accordingly, to succeed on its claim, Plaintiff must be able to show that Defendant's post-acquisition actions "offend established public policy" and are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Id.  Although the FDUTPA is to be "construed liberally" in order to achieve its remedial goal, Fla. Stat. ch. 501.202, its reach is not limitless.  Indeed, Florida courts have repeatedly dismissed claims under the FDUTPA involving activities that may well be construed as "unfair" on some level.  See, e.g., Rosa v. Amoco Oil Co., 262 F. Supp. 2d 1364, 1368-69 (S.D. Fla. 2003) (dismissing FDUTPA claim based on oral misrepresentations to plaintiff made prior to entering into written agreement conflicting with those misrepresentations); Yachting Promotions, Inc. v. Broward Yachts, Inc., 792 So. 2d 660, 664 (Fla. 4th DCA 2001) (no unfair practice in plaintiff's refusal to do business with defendant that had previously commenced lawsuit against plaintiff); In re Crown Auto Dealerships, Inc., 187 B.R. 1009, 1018 (Bankr. M.D. Fla. 1995) (dismissing FDUTPA claim against car dealership fraudulently selling previously stolen cars as new); Chicken Unlimited, Inc. v. Bockover, 374 So. 2d 96, 97 (Fla. 2d DCA 1979) ("indisputably misleading, if not false" statements made by franchisor to prospective franchisee was insufficient to support FDUTPA claim).

The complained-of actions here simply do not fall within the rubric of "unfair acts." Notably, with the exception of a few items discussed separately below, see infra at 16-17, Plaintiff does not argue that it has been treated less favorably by its franchisor (Franco)

13

since the acquisition.[11]   Rather, Plaintiff predicates its FDUTPA claim on Defendant's allegedly more favorable treatment of HoneyBaked Ham franchisees.  Plaintiff appears to suggest that, because it has been acquired by the franchisor of the HoneyBaked Ham system (a competitor), it should be permitted to purchase meat, advertise, utilize a shipping center, and take advantage of all other benefits on the same terms as the HoneyBaked Ham franchisees; absent the ability to do so, Plaintiff maintains that it suffers a FDUTPA violation.  See Opposition at 7-13 (DE 52).  Yet, Plaintiff has failed to cite any caselaw or other precedent for the proposition that it is immoral, unethical, oppressive, or unscrupulous for a corporation to treat two related, yet competing, entities differently.  And the Court has been unable to locate on its own any cases standing for that proposition. Furthermore, Defendant has advanced several reasons for its treating Heavenly Ham franchisees differently from HoneyBaked Ham franchisees; those reasons include the number of stores in each system, their respective revenues, and their respective average sales.  See Reply at 2-3 (DE 54); see also Plaintiff's Undisputed Facts (DE 51) at 2, ¶ 19; Id. at 8, ¶ 11; Plaintiff's Exhibit B at 53.[12]  These explanations neither "offend[] established public policy" nor are they "immoral, unethical, oppressive, or unscrupulous"; indeed, they appear to be legitimate business reasons.

Carried to its logical conclusion, Plaintiff's argument would entitle every acquired entity to enjoy the same benefits as the acquiring entity, lest the FDUTPA be violated,

---

[11] Had Plaintiff so alleged, its claim would have been subject to arbitration.  See supra note 5.  Moreover, Plaintiff has not asserted a claim against Defendant for tortious interference with Plaintiff's rights (and Franco's obligations) under the franchise agreement.

[12] Plaintiff's Exhibits are attached to a Notice of Filing dated July 22, 2004 (DE 53).

Case 0:03-cv-61198-BSS   Document 66   Entered on FLSD Docket 12/21/2004   Page 15 of 25

regardless of the comparative size, revenue, and purchasing power of the respective entities. As applied to the facts of this case, such an entitlement "would be tantamount to subsidizing the Heavenly Ham system with money generated by the HoneyBaked Ham system." Memorandum at 3 (DE 54). There exists no support, legal or otherwise, for such an entitlement.

In addition, although Plaintiff bases its claim on Defendant's post-acquisition conduct, most of the items about which Plaintiff complains appear wholly unrelated to the acquisition and did not change as a result thereof. Among its complaints, Plaintiff asserts that: (1) HoneyBaked Ham franchisees were offered a reduction in first-year advertising expenditures, while Heavenly Ham franchisees were not, see Opposition at 8 (DE 52); (2) HoneyBaked Ham "typically" purchases all available free-standing advertising inserts in local newspapers in Plaintiff's market during prime advertising months, see id. (DE 52); (3) HoneyBaked Ham franchisees can submit orders to a shipping center as late as 3:00 p.m., while Heavenly Ham franchisees are required to submit orders to the same shipping center by 8:00 a.m., see id. at 9 (DE 52); (4) HoneyBaked Ham franchisees were offered a reduction in royalties, yet that reduction was not offered to Heavenly Ham franchisees, see id. at 11 (DE 52); and (5) HoneyBaked Ham franchisees pay less per pound for ham and turkey than Heavenly Ham franchisees, see id. at 11-12 (DE 52). Plaintiff has proffered no evidence that any of the above items bore any connection to the acquisition; indeed, it appears that each would have taken place regardless of whether the acquisition had occurred.[13]  Additionally, the record does not suggest that Plaintiff has been treated

_____

[13] Plaintiff also directs the Court's attention to two purportedly false statements made by Defendant's CEO, Linda van Rees, on June 17, 2002, shortly after the acquisition had

worse with regard to any of the foregoing items since the acquisition; in fact, in some cases Plaintiff appears to have been treated better.[14]   The Court perceives no reason why Defendant's pre-acquisition conduct, which was wholly unrelated to the Heavenly Ham system and which Plaintiff has nowhere suggested was improper, could suddenly be rendered unlawful by virtue of Defendant's acquisition of Plaintiff's franchisor.

Further, the Court does not consider the few allegedly unfair actions that arguably were related to the acquisition – (1) plans to update the Heavenly Ham website were placed on hold, see Opposition at 8-9 (DE 52); (2) certain Heavenly Ham stores have closed and new franchises are not being opened, lowering Heavenly Ham's brand recognition, see id. at 10-11 (DE 52); (3) field support has declined due to limited resources, see id. at 12 (DE 52); and (4) a pre-acquisition plan to install a point-of-sale

---

been consummated. See Opposition at 4-7 (DE 52). In those statements, van Rees averred that the Heavenly Ham system (1) would be "managed separately" by Defendant and (2) "plan[ned] to add a significant number of franchise stores during the next few years." See Opposition at 4-5 (DE 52). Plaintiff claims that the former statement was "patently and demonstrably false" because Defendant and Franco share the same business address and share several executives "holding identical or virtually similar titles in both entities." Id. at 6 (DE 52). Plaintiff, however, does not appear to base its FDUTPA claim on this purportedly false statement; nor has Plaintiff asserted any other claim (e.g., tortious interference with contract) based thereon. Further, Plaintiff has not proffered any evidence linking the purportedly false statement to its alleged damages. In any event, the fact that Defendant and Franco operate from the same building and utilize many of the same managers does not necessarily mean that the two are not separately managed, and Plaintiff has proffered no other evidence indicating that the statement was false when made. As to the latter statement, Plaintiff has proffered no evidence indicating that at the time of the acquisition, Defendant did not "plan" to open additional Heavenly Ham franchises. Regardless, as with the other challenged statement, Plaintiff has failed to show that the statement has proximately caused it damages. See infra at 18-24.

[14] For example, Plaintiff's meat costs have dropped since the acquisition, although Plaintiff apparently attributes that drop to a change in accounting practices rather than to an acquisition-related benefit. See Haglund Dep. at 101-06.

system to enhance efficiency in Heavenly Ham stores was scrapped, see id. at 13 (DE 52) – either individually or collectively, to be "unfair" under the FDUTPA. While each may have represented a change in conduct resulting from the acquisition, Plaintiff has failed to proffer any evidence that these actions resulted from anything other than reasonable business judgments, let alone that any was taken for an ulterior motive. The Court has been presented with no evidence on which it might conclude that Defendant's acquisition-related conduct was "immoral, unethical, oppressive, [or] unscrupulous" such that the broad concerns of the FDUTPA are implicated.[15]

Plaintiff's reliance on Gossard v. Adia Services, 723 So. 2d 182 (Fla. 1998), in support of its argument is misplaced. In Gossard, the Florida Supreme Court answered in the affirmative the following certified question from the Eleventh Circuit: "Whether Florida law recognizes a claim for tortious interference against a corporation which purchases as a subsidiary a corporation which has a preexisting obligation not to compete against its franchisee, Plaintiff herein, and subsequently purchases another subsidiary which is in direct competition with the franchisee?" Id. at 183. Aside from the distinct nature of the claims – Gossard was a tortious interference case and not a FDUTPA case – the critical distinction between the case sub judice and Gossard is that the defendant there caused its subsidiary to breach a contractual obligation not to compete against the plaintiff. No such breach has occurred in this case, and Plaintiff has alleged none; in fact, the franchise agreement expressly authorizes Paradise to "merge, acquire, joint venture

_____

[15] In any event, assuming arguendo that these actions fall within the FDUTPA's ambit, Plaintiff has failed to show that they have proximately caused Plaintiff actual damages. See infra at 18-24.

or affiliate with any existing franchise business, whether competitive or not."  Plaintiff's Undisputed Facts at 2, ¶ 13 (DE 51).

Simply stated, Plaintiff has failed to come forward with any evidence of post-acquisition conduct by Defendant that is either "immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers."  <u>PNR, Inc.</u>, 842 So.2d at 777. Plaintiff's FDUTPA claim, therefore, cannot survive Defendant's Summary Judgment Motion.[16]

B.   Plaintiff has Failed to Show that it has Suffered
<u>Actual Damages Proximately Caused by Defendant's Actions</u>

Plaintiff's FDUTPA warrants dismissal for another, yet equally compelling, reason: Plaintiff has failed to show that it suffered any damages as a result of Defendant's purportedly "unfair" conduct.  As noted above, damages are a necessary element of a FDUTPA claim seeking legal (as opposed to equitable) relief.  <u>See</u> <u>supra</u> at 8-9; Fla. Stat. ch. 501.211 ("In any action brought by a person <u>who has suffered a loss as a result of a violation of [the FDUTPA]</u>, such person may recover actual damages . . . .") (emphasis added).  In the absence of actual damages attributable to a FDUTPA violation, Plaintiff's

_____

[16] Defendant previously filed a Motion to Dismiss and supporting Memorandum of Law (DE 10, 11) in which it argued that its actions were not "unfair" under the FDUTPA. The Court denied that Motion by Order dated November 7, 2003 (DE 19).  That ruling is not inconsistent with the conclusion herein that Defendant's actions did not violate the FDUTPA.  In ruling on Defendant's prior Motion, the Court was required to accept as true all allegations in Plaintiff's Complaint and grant the Motion only if it appeared "beyond doubt" that Plaintiff could "prove no set of facts in support of [its] claim which would entitle [it] to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  At that early stage of the proceedings, without further development of the factual predicate supporting Plaintiff's claim, the Court could not conclude that it was "beyond doubt" that Plaintiff could prove "no set of facts" sufficient to support its FDUTPA claim.  Now that Plaintiff has developed the record and laid bare the facts supporting its claim, it is evident that Plaintiff's claim cannot stand.

claim must be dismissed.  See, e.g., Haun v. Don Mealy Imports, Inc., 285 F. Supp. 2d 1297, 1307 (M.D. Fla. 2003) (denying FDUTPA claim of automobile purchaser; after purchaser was denied for financing, his down payment was returned to him and he was not required to pay for vehicle); Macias, 694 So. 2d at 90 (affirming dismissal of FDUTPA claim because Plaintiff sustained no actual loss; claim had been brought by radio listener deprived of opportunity to compete for prize in contest prematurely terminated by Defendant); Himes, 518 So. 2d at 938 (rejecting FDUTPA claim based on alleged lost investment opportunity; "Since Himes did not suffer any out-of-pocket damages, the trial court properly denied him recovery because his claimed damages for lost profits are speculative.").

As a general rule,

the measure of actual damages [under the FDUTPA] is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.  A notable exception to the rule may exist when the product is rendered valueless as a result of the defect – then the purchase price is the appropriate measure of actual damages.

Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati, 715 So. 2d 311, 314 (Fla. 4th DCA 1998) (citations omitted).  Here, Plaintiff does not seek lost profits – the profits it bargained for when it purchased the franchise as contrasted with the profits it has made since the acquisition – as a result of Defendant's conduct.  See Opposition at 20 (DE 52); Haglund Dep. at 97.  Rather, Plaintiff claims that its franchise has been rendered "valueless" because of Defendant's decision to stop opening Heavenly Ham stores.  According to Plaintiff, it has been unable to sell its Heavenly Ham franchise as a result of that decision:

Q:      [By Defendant's counsel]: Have you made attempts to sell your store?

A:     Yes.  We have had several parties that expressed interest.  And one of the first questions that they ask is, where is the closest Heavenly Ham?  Can we develop more stores?  Can anybody develop more stores?  And when we tell them no, not at this time, they're shocked.

Q:     And what do they say after [they] get over their shock?

A:     Well.  Some of the comments we have heard were, why else would you buy a franchise if you can't open more stores?  What would be the point?

Q:     And at that point they lose interest?

A:     It has been a tremendous hurdle.

Opposition at 18-19 (DE 51) (quoting Covello Dep. at 39).  Plaintiff argues that "as a direct and proximate [result] of the decision to cease the sale of Heavenly Ham franchises and cease the opportunity for franchisees to acquire additional Heavenly Ham franchises," it has been unable to sell its franchise, and therefore the franchise has been "rendered valueless."  Opposition at 19 (DE 52).  Accordingly, Plaintiff seeks to recoup its "purchase price," that is, its initial investment in the franchise.  See id. (DE 51).

Preliminarily, the Court notes that Plaintiff appears to confuse the two methods of calculating damages set forth in Corgnati.  On one hand, Plaintiff cites the "exception" to the "difference in market value" measure of damages when a product has been rendered "valueless," and Plaintiff apparently believes that its franchise has been rendered valueless as a result of Defendant's conduct.  See Opposition at 18-19 (DE 52).  On the other hand, however, Plaintiff confusingly attempts to calculate its alleged damages by applying the other method – "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."  See id. at 19 ("The 'difference in market

20

value' of [Plaintiff's] franchise can be measured by looking at its value at the time that [Plaintiff] purchased the franchise (as measured by what [Plaintiff] paid to acquire the franchise, *i.e.*, its actual value at the time) and its value after the Acquisition (as measured by its resale value).").[17] Yet, regardless of which formulation is used, however, Plaintiff's purported damages are the same:  if the "exception" calculation applies, Plaintiff's damages are equal to the franchise's "purchase price" – Plaintiff's initial investment in the franchise; if the "difference in market value" measure is used, Plaintiff's damages equal the franchise's original value (the initial investment) minus the franchise's alleged current value (zero) – namely, the initial investment amount.

The Court cannot agree that Plaintiff's franchise is "valueless" simply because Plaintiff has been unable to sell it.  The undisputed evidence demonstrates that Plaintiff's Heavenly Ham franchise struggled initially (losing money in 2001 and 2002), but turned a modest profit in 2003 and in the first four months of 2004 (after the acquisition).  See Expert Report Exhibit F at 17 (attached as Exhibit 1 to Defendant's Supplemental Memorandum in Support of its Motion for Summary Judgment (DE 62)).  The Court rejects the suggestion that a profitable business may be deemed "valueless" simply because Plaintiff has thus far been unable to sell it.  Moreover, the fact that Plaintiff turned a profit for the first time only <u>after</u> the acquisition belies any causal connection between the

---

[17] Such a damages formulation likely does not apply in cases alleging "unfair" acts like those at issue here.  <u>See</u> David J. Federbush, <u>Damages Under FDUTPA</u>, 78 Fla. B.J. 20 (May 2004) ("Unfair and unconscionable acts or practices under FDUTPA need not be deceptive.  The difference in market value measure of damages, *i.e.*, of the product as it should have been delivered and as it was delivered, is essentially tied to misrepresentation.  It thus cannot provide the measure of damages for FDUTPA violations not subsuming misrepresentations.").

21

acquisition and Plaintiff's franchise being rendered "valueless."  Indeed, Haglund testified that Plaintiff's sales have actually increased since the acquisition.  See Haglund Dep. at 15.[18]

In addition, Plaintiff's argument that its franchise is "valueless" is predicated on an unwarranted leap in logic:  because it has been unable to sell its franchise thus far, it cannot sell it at all.  Yet, Plaintiff neglects to mention that, to date, it has offered to sell its franchise only for more than $300,000, an amount far greater than what Plaintiff spent to acquire and to improve the franchise in the first place.  See Covello Dep. at 44 (Plaintiff has been seeking "just under $300,000," plus the assumption of the balance of its lease, for its franchise); Haglund Dep. at 24-25 (noting Plaintiff paid $30,000 for Davie, Florida franchise it took over); Letter from Heather Haglund and Jody Covello to Charles Bengochea at 2 (Exhibit 3 in Volume 2 of Defendant's Exhibits to its Motion for Summary Judgment (DE 42)) (listing start-up costs as "Franchise Transfer Fee" of $7500, "Franchise Discovery and Training Expenses" of $3500, and "Leasehold Improvements and Equipment Costs" of $195,455.26, for a total of $236,455.26 (when combined with $30,000

---

[18] Plaintiff's expert also opines that Plaintiff's franchise "has a minimal value."  See Expert Report at 2 (attached as Exhibit 1 to Defendant's Supplemental Memorandum in Support of its Motion for Summary Judgment (DE 62)).  The expert's report reveals only one basis on which he reaches that conclusion and that is in any way tied to the acquisition:  "[t]he Heavenly Ham franchise brand is no longer being marketed for expansion, and therefore any current owner of a Heavenly Ham franchise would not be able to add any additional locations.  This substantially eliminates any potential for growth." Id.  In other words, both Plaintiff and Plaintiff's expert contend that there is only one post-acquisition action taken by Defendant that has rendered Plaintiff's Heavenly Ham franchise "valueless":  the decision to stop selling Heavenly Ham franchises.

Plaintiff paid to Davie franchise's prior owner)).[19]  It is unavailing for Plaintiff to argue that

its franchise cannot be sold (and, hence, is valueless) solely because it has not yet been

able to sell it at a substantial profit; Plaintiff's inability to sell the franchise at such a price

(and profit level) does not permit the inference that the franchise cannot be sold at all.

Moreover, as a matter of law, Plaintiff cannot show that it has suffered actual

damages.  Plaintiff theorizes that it cannot sell its Heavenly Ham franchise because no new

franchises may be opened.  Yet, Plaintiff admits that it has never enjoyed a contractual

right to open additional Heavenly Ham franchises.  See Plaintiff's Undisputed Facts at 2,

¶ 10 (DE 51); Id. at 5-6, ¶ 48 (DE 51).[20]  Because Plaintiff admittedly has never enjoyed

the right to open additional franchises, it could never have transferred that right as part of

a sale of its franchise.  Stated differently, if the Court were to accept Plaintiff's argument

– the franchise is currently "valueless" because Plaintiff cannot open additional franchises

– then Plaintiff's franchise must necessarily have been "valueless" when it was acquired

because Plaintiff did not enjoy the right to open additional Heavenly Ham franchises at that

---

[19] Covello testified that Plaintiff has offered to sell the franchise for a payment of "just under $300,000," along with the assumption of Plaintiff's lease.  See Covello Dep. at 44. The balance due under that lease as of early 2003 was $294,000.  See Letter from Heather Haglund and Jody Covello to Charles Bengochea at 2 (Exhibit 3 in Volume 2 of Defendant's Exhibits to its Motion for Summary Judgment (DE 42)).

[20] Plaintiff argues that principals at Paradise informed Plaintiff that it could open additional stores and that Plaintiff would have a "right of first refusal" to develop additional Heavenly Ham franchises.  See Opposition at 4 (DE 52); Plaintiff's Undisputed Facts at 5-6, ¶ 48 (DE 51); Id. at 7, ¶ 8 (DE 51).  Plaintiff cannot rely on these alleged misrepresentations, however, given the express integration clause in the franchise agreement.  See Rosa, 262 F. Supp. 2d at 1368 ("A party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract.") (citing Hillcrest Pacific Corp. v. Yamamura, 727 So. 2d 1053, 1056 (Fla. 4th DCA 1999)).

time.  Thus, the value of Plaintiff's franchise pre-acquisition and its value post-acquisition would have been the same: "valueless" when acquired and "valueless" today because Plaintiff then, as now, enjoyed no right to open additional franchises.

IV.    Conclusion

Plaintiff cannot show that Defendant's disparate treatment of the HoneyBaked Ham franchise system *vis-a-vis* the Heavenly Ham franchise system was "unfair" under the FDUTPA.  Nor can Plaintiff show that it has been damaged as a result of Defendant's purportedly "unfair" conduct.  For these reasons, as detailed above, it is hereby ORDERED that Defendant's Motion for Summary Judgment (DE 33) is GRANTED, and this case is DISMISSED WITH PREJUDICE.  All pending motions are DENIED AS MOOT.  A separate judgment shall be entered accordingly.

DONE AND ORDERED in Fort Lauderdale, Florida, this 20 day of December 2004.

BARRY S. SELTZER
United States Magistrate Judge

Copies to:

Robert Zarco, Esq.
Alejandro Brito, Esq.
Zarco Einhorn & Salkowski, P.A.
Bank of America Tower
100 S.E. 2nd Street, 27th Floor
Miami, FL 33131

James C. Rubinger, Esq.
Wiley Rein & Fielding LLP
1776 K Street, NW
Washington, D.C. 20006

Ace J. Blackburn, Jr., Esq.
Cooney, Mattson, Lance, Blackburn, Richards & O'Connor, P.A.
2312 Wilton Drive
P.O. Box 14546
Fort Lauderdale, FL 33302